UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DORMAN PRODUCTS, INC.,

    Plaintiff,

v.

DAYCO PRODUCTS, LLC.,

    Defendant.
                                        /

Case No. 2:10-cv-12168

HONORABLE STEPHEN J. MURPHY, III

**OPINION & ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO DISMISS** (Docket No. 12)

Plaintiff, Dorman Products, Inc. filed a five-count complaint in the United States District Court for the District of Delaware, against Defendant, Dayco Products, LLC. The case was transferred to this Court pursuant to Dayco's Motion to Transfer. The complaint alleges: defamation (Count I), trade disparagement (Count II), tortious interference with a prospective contractual relationship (Count III), unfair competition in violation of Pennsylvania law (Count IV), and unfair competition and false advertising in violation of federal law (Count V). Dayco moves to dismiss counts I, III, and IV. For the following reasons, the Court will partially grant Dayco's motion as to Count I, and fully grant the motion as to Counts III and IV.

**FACTS**

Dorman, a Pennsylvania company, is a leading supplier of automotive replacement, hardware and brake parts in the automotive aftermarket. Compl. ¶¶ 1, 15. In 2009, Dorman launched a line of automatic belt tensioners for the automotive aftermarket.[1] Dorman

---

[1] Belt tensioners are used in vehicles with serpentine belts to maintain tension on the serpentine belt. Compl. ¶ 15.

asserts that all of its automatic belt tensioners comply with applicable Society of Automotive Engineers (SAE) standards.[2] *Id.* ¶ 22. According to Dorman, "automotive industry and automotive customers place a high value on the SAE standards." *Id.* ¶ 21.

Dayco Products LLC, incorporated in Delaware, is one of the dominant suppliers of automatic belt tensioners used in the manufacture of new automobiles and also supplies the automotive parts aftermarket with automatic belt tensioners. *Id.* ¶ 17. Dorman alleges that when it entered the automatic belt tensioner market, its automatic belt tensioners "garnered immediate attention" among aftermarket customers because "they provide significant value" at "significantly" lower prices than those charged by Dayco and other suppliers. *Id.* ¶ 19. Dorman asserts that this created a competitive threat to the high profit margins of other manufacturers, including Dayco. *Id.* ¶ 23.

Dorman alleges that in response to its entry into the market Dayco prepared, published, and distributed a PowerPoint presentation to customers throughout the United States. *Id.* ¶ 24. The presentation asserted that Dayco's automatic belt tensioners "are designed and assembled to exacting standards of form, fit, and function," and that tested under the same standards, "eight [of twenty] Dorman tensioner part numbers had failed to meet performance standards."[3] *Id.* ¶ 25.

Dorman asserts that the testing referenced in the Dayco presentation was conducted in-house by Dayco and that Dayco did not rely on SAE standards but instead, used its own

---

[2] SAE is a standards setting organization, which has established a number of standards utilized in the automotive industry. Compl. ¶¶ 21-22.

[3] In the presentation, Dayco asserted, among other things, that: five Dorman tensioners failed due to low Torque; one failed due to high Torque; one failed by locking up before reaching the installation stop; and one failed due to "excessive damping." Compl. ¶ 25.

specifications, which did not employ reliable scientific testing methodology or statistical analysis. *Id.* ¶¶ 26, 29, 31. Dorman alleges that, despite this, Dayco's presentation was intentionally designed to mislead aftermarket customers into believing that Dayco tested Dorman's automatic tensioner belts under applicable industry standards, including relevant SAE technical standards. *Id.* ¶¶ 27-28. Dorman asserts that because aftermarket customers place a high value on SAE standards, this "deception" by Dayco "is likely to influence" aftermarket customers in their purchasing decisions. *Id.* ¶ 32.

On August 10, 2009, Dayco filed a lawsuit against Dorman in this Court ("Dayco Lawsuit"), alleging claims of trade dress infringement, false advertising, and unfair competition based on Dorman's sale of automatic belt tensioners. In that action, Dayco alleges that Dorman's automatic belt tensioners are inferior to Dayco's. *Id.* ¶ 34.

On August 13, 2009, an email announcement regarding the Dayco Lawsuit was prepared, published, and distributed by Dayco to customers in the aftermarket throughout the United Sates. *Id.* ¶ 37. The email stated that Dayco believed that Dorman imported its belt tensioners from China.[4] *Id.* It further asserted that Dayco had concerns that "Dorman's designs may mislead consumers due to the similarity in the external appearance of corresponding Dayco tensioners," and that "confusion in the marketplace regarding the source of the Dorman products may adversely affect Dayco's reputation as a provider of superior belt tensioner products." *Id.*; ex. C.

Dorman asserts in the present action that Dayco also provided this email to industry

---

[4] The email asserted that "[Dayco is] also concerned that Dorman (which is believed to import its belt tensioners from China) is using marketing materials that may create the impression that competitors like Dayco are not manufacturers, when in truth Dayco produces the vast majority of its tensioners in its own manufacturing facility in Spingdale, Arkansas, USA."

publications, including Aftermarket News and Automotive Week/The Greensheet. *Id.* ¶ 40. On August 14, 2009, Aftermarket News published an online story that was "virtually identical" to Dayco's email. *Id.* ¶ 41. On August 21, 2009, Automotive Week/The Greensheet, a weekly independent newsletter covering the automotive afterparts industry, published a front page story regarding the lawsuit, in which it stated that "Dayco accuses Dorman of making false statements about the two companies products and intentionally deceiving purchasers" by selling products that look similar to Dayco's but that are of "inferior quality." *Id.* ¶ 42.

Dorman also now alleges that an interview published on Dayco's homepage with Dayco President and SAE member Dennis Walveart, entitled "Differentiate Between Quality and Sub-Standard Parts", was part of an intentional pattern by Dayco to convey that "lower cost, private label aftermarket parts" are of inferior quality to Dayco's "simply because they are less costly" than the original equipment manufacturers' name brands.[5] *Id.* ¶ 45.

---

[5] In the interview Walvert stated: "Probably one of the biggest issues the aftermarket is facing is trying to distinguish between good quality parts and parts that may not have the quality that our technicians need to service our customers. There's a lot of product coming from all over the world, some of that's good – some of that's not good, and the technician has a very difficult time separating what is good and what isn't and I think that as a manufacturer, we need to make sure that we offer products that are good for the industry, and we believe that we do. I think that getting that word out to the technician base is what the real challenge is for our entire industry. I think that the way to really do that is to continue our brand strategy. I think if a technician goes to a name brand, whether it's Dayco, which is ours, or Federal Mogul, or Gates, our competition, they can assure themselves that they're going to get a good quality product. They go to a private brand, not necessarily 100% guarantee that's going to be a good quality product. I think that's a big, big challenge. A lot of pressure on the industry right now for. . .with margin pressures and there has to be. . .and a lot of people try to find a lower cost product in order to overcome that but sometimes that means lower quality too, and then that creates ripples all the way up and down the channel, so I think brand strategy is very important, and having very good quality brands out there that the technicians can count on will help us all."

Dorman alleges that Dayco's brand strategy of "falsely denigrating private label aftermarket parts" has directly affected the views of aftermarket customers in the market for automatic belt tensioners. *Id.* ¶ 46. In support of this allegation, Dorman submits that the NPD Group, a market research firm focused on the automotive aftermarket industry, recently reported that consumers of aftermarket products perceive a quality difference between private label and name brands. Compl. ¶ 47.

Based on these allegations, Dorman has now sued Dayco in a five-count complaint. Dayco moves to dismiss Count I for defamation, Count III for tortious interference with prospective contractual relationships, and Count IV for unfair competition under Pennsylvania Law.

## LEGAL STANDARD

Rule 12(b)(6)[6]

"[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (citations omitted). Accordingly, Federal Rule of Civil Procedure 12(b)(6) allows a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true. *See Minger v. Green*, 239 F.3d 793, 797 (6th Cir. 2001) (citations omitted). "To survive a motion to dismiss under

---

[6] Dorman asserts that it is questionable whether the motion currently under review should be considered a 12(b)(6) motion or a 12(c) motion "given that Dayco did not file its motion until several months after it filed its motion to dismiss under the 'first to file' rule in the United States District Court of Delaware." (Doc. No. 14 at 1). Dorman concedes, however, that regardless of whether the motion is a 12(b)(6) or a 12(c) motion, the same standard applies. The Court treat the motion as one filed pursuant to Rule 12(b)(6).

Rule 12(b)(6) motion, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Hunter v. Sec'y of the U.S. Army*, 565 F.3d 386, 992 (6th Cir. 2009) (quoting *Advocacy Org. for Patients and Providers v. Auto Club. Ins. Ass'n,* 176 F.3d 315, 319 (6th Cir. 1999)).

In assessing a motion brought pursuant to Rule 12(b)(6), the Court must presume all well-pleaded factual allegations in the complaint to be true and draw all reasonable inferences from those allegations in favor of the non-moving party. *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008). To determine whether Plaintiff has stated a claim, the Court will examine the complaint and any written instruments that are attached as exhibits to the pleading. Fed. R. Civ. P. 12(b)(6) & 10(c). Although the pleading standard is liberal, the court need not accept as true any legal conclusion alleged therein, even if crouched as a factual allegation. *Ashcroft v. Iqbal*, 129 S.Ct. 137, 145 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Although "a complaint need not contain 'detailed' factual allegations, its '[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true.'" *Ass'n of Cleveland Fire Fighters v. Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Bell Atlantic*, 550 U.S. at 555). Therefore, the Court will grant a motion for dismissal pursuant to Rule 12(b)(6) only in cases where

there are simply not "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic*, 550 U.S. at 570. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief." *Iqbal*, S.Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

## ANALYSIS

A. Local Rule 7.1

As a preliminary matter, Dorman asserts that the Court should dismiss Dayco's motion in its entirety because Dayco failed to seek Dorman's concurrence before filing a motion to dismiss in accordance with Local Rule 7.1(a). Dorman argues that courts have dismissed motions outright for failure to comply with this rule. *See, e.g., Washington v. Randall-Owens*, No. 06-112588, 2007 WL 1153042, at *3 (E.D. Mich., Apr. 18, 2007) (denying plaintiff's motion for ex parte discovery for failure to comply with Local Rules 7.1 and 37.1). While parties should comply with all local rules, the Court will not dismiss Dayco's claims for failure to comply with Rule 7.1(a). Dorman does not assert that they were prejudiced by Dayco's failure, and as both parties have fully briefed the motion, it does not appear that Dorman would have granted concurrence had Dayco sought it. Further, unlike in *Washington*, the instant motion does not deal with discovery, but rather, with dismissal for failure to state a claim. The Sixth Circuit has held that "[Rule 7.1(a)] is largely an empty formality in the case of dispositive motions since, if the other party agreed, the parties could simply stipulate to a dismissal." *Walls v. Detroit*, 993 F.2d 1548, 1993 WL 158498, at *4, fn.2 (6th Cir. 1993).

B. Count I: Defamation

Dayco asserts that Dorman has not stated a claim for defamation pursuant to Pennsylvania law, but rather, has only stated a claim for trade disparagement, alleged in Count II of the complaint, that Dayco has not moved to dismiss.[7] Dayco further argues that its statements were directed at Dorman's products, not at Dorman itself, and that, therefore, the statements cannot be defamatory in nature.

To make out a claim for defamation under Pennsylvania law, a plaintiff must prove: "I) the defamatory character of the communication; ii) its publication by the defendant; iii) its application to the plaintiff; iv) the understanding of the recipient of its defamatory meaning; v) the understanding of the recipient of it as intended to be applied to the plaintiff; vi) special harm resulting to the plaintiff from its publication; and vii) abuse of a conditionally privileged occasion." *Moore v. Cobb-Nettleton*, 889 A.2d 1267 (Pa. Super.Ct. 2005) (internal citations and quotation marks omitted).

It is for the Court to decide in the first instance whether a statement is capable of defamatory meaning. *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 923 (3rd Cir. 1990) . Under Pennsylvania law, a defamatory statement is one that "tends to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from association or dealing with him." *Id.* at 923 (citing

---

[7] Both parties apply Pennsylvania law to the state law claims based on diversity jurisdiction. 28 U.S.C. §1332. In a diversity action, the Court applies the substantive law of the forum state. *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009). When conflicts exist, the court should consider which jurisdiction has the greatest interest in establishing the legal standards that will be applied to the case. *Radeljak v. Daimler Chrysler Corp.*, 475 Mich. 598, 629 (2006). Aside from Dorman pointing out that it is a Pennsylvania company, neither party makes any argument about which jurisdiction has the greatest interest. Since both parties apply Pennsylvania law to this motion, the Court will do the same. It should be noted, however, that Dayco merely "assumes" it applies, though does not "concede" that it does.

*Birl v. Philadelphia Elec. Co.*, 167 A.2d 472, 475 (Pa. 1960)).[8] In the case of business defamation claims, courts look to whether the defendant made a statement that "clearly imputes, to the person to whom it refers, characteristics and conduct which are incompatible with the proper and lawful exercise of a business." *Cosgrove Studio & Camera Shop, Inc. v. Pane*, 182 A.2d 751, 753 (Pa. 1962). Further, "any language which unequivocally, maliciously, and falsely imputes to an individual or corporation want of integrity in the conduct of his or its business is actionable." *Id.* at 754.

The Third Circuit has explained that under Pennsylvania law, a statement directed at the quality of a company's goods, rather than at the company itself, can cross the line from disparagement to defamation when "[the statement] imputes to the corporation fraud, deceit, dishonesty, or reprehensible conduct in its business in relation to said goods or products." *U.S. Healthcare*, 898 F.2d at 924 (citing *Cosgrove Studio*, 182 A.2d at 753) (when a competitor's advertisement accused plaintiff, who was engaged in the film development business, of "ruining snapshots, using inferior materials, and printing blurred negatives in order to inflate the cost" of plaintiff's product, the words lowered plaintiff in the

---

[8] A commercially disparaging claim, on the other hand, is one "which is intended by its publisher to be understood or to reasonably be understood to cast doubt upon the existence or extent of another's property in land, chattels, or intangible things, or upon their quality. . .if the matter is so understood by its recipient." *U.S. Healthcare, Inc.* 898 F.2d at 924 (quoting *Menefee v. Columbia Broadcasting Sys., Inc.*, 329 A.2d 216 (Pa. 1974)). Courts have long recognized that defamation and disparagement are two distinct torts. *See Zerpol Corp. v. DMP Corp.,* 561 F. Supp. 404, 408 (E.D. Pa. 1983). In *Zerpol*, the court held that: "While alike in many respects, there are important differences between the two [which] are largely explained by the interests the two torts are designed to protect. The action for defamation serves to protect one's interest in character and reputation. The cause of action for disparagement, on the other hand, protects economic interests by providing a remedy to one who suffers pecuniary loss from slurs affecting the marketability of his goods." *Id.*

estimation of the community and were actionable); *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 271 (3rd Cir. 1980) (when defendant suggested that plaintiff deceived its customers in regard to both price and quality of products and stated that plaintiff's characterization of products was "total misrepresentation," words were capable of defamatory meaning)).

To the extent that Dorman bases its defamation claim on statements made by Dayco that assert or imply only that Dorman's products are inferior, it has failed to state a cause of action. Allegations that another company's products are inferior are "par for the course" in business and are "the most innocuous kind of puffing," generally not capable of misleading the public. *U.S. Healthcare, Inc.,* 898 F.2d at 925 (statement by Blue Cross-Blue Shield asserting that personal choice insurance was "Better than HMO" not actionable as defamation claim by U.S. Healthcare, a leading provider of HMOs); *See also Polygram Records, Inc. v. Superior Court*, 170 Cal. App.3d 543, 550 (Cal. Ct. App. 1985) ("[F]alse statements simply indicating that plaintiff's business goods were of inferior quality...do not accuse plaintiff of dishonesty, lack of integrity or incompetence nor even imply any reprehensible personal characteristic, and are therefore not defamatory."). The statements made in Dayco's email announcement asserting that Dorman's products are inferior, Compl. ¶ 37,[9] and the interview with Walveart, Compl. ¶ 45, are examples of "puffing" and

---

[9] This encompasses both the statement that Dorman is believed to import its goods from China, which Dorman alleges is "an accusation synonymous with inferior products and designed to scare consumers with visions of lead-tainted products, Chinese drywall, and cadmium-laced children's toys," and the statement that "Dayco's complaint also expresses concern that confusion in the marketplace regarding the source of the Dorman products may adversely affect Dayco's reputation as a provider of superior belt tensioner products." Compl. ¶ 37; Dorman Brief, Docket No. 14 at 7.

are not defamatory in nature. Further, insofar as Dorman alleges that statements made in the Dayco Lawsuit are defamatory, any statements merely asserting that Dorman's products are inferior are likewise not defamatory.

Statements which are capable of being construed as suggesting that Dorman misrepresented the quality of its products, however, are actionable because they "clearly [impute]. . .characteristics and conduct which are incompatible with the proper and lawful exercise of a business." *Cosgrove Studio,* 182 A.2d at 753. Although not as direct as the statements made by defendants in *Cosgrove* and *Steaks*, several of the statements made by Dayco still have the capacity to impute dishonesty or improper business practices to Dorman.

Taking all factual allegations as true, which the Court must on a 12(b)(6) motion, Dorman's products comply with SAE standards. Dayco's assertions in its presentation that its products "are designed and assembled to exacting standards" and that tested under the same standards, Dorman products were found to be defective, have the potential of suggesting that Dorman misled the public into believing that their products are in conformance with SAE standards when they are not. The statement further suggests that Dorman misrepresented the quality of its products because, according to Dayco, the products are defective.

Further, several of Dayco's statements impute to Dorman an intent to mislead the public. Dayco's powerpoint presentation allegedly asserts that the resemblance between Dayco and Dorman products is not a coincidence. Compl. ¶ 25; ex. A. Dayco further alleges in the Dayco Lawsuit and in the subsequent email regarding the lawsuit, that Dorman infringed on Dayco's trade dress and that, therefore, Dorman's products may

11

mislead customers into believing that the products are Dayco's. Dayco's argument that the statements are not defamatory because they assert only that Dorman's products may mislead customers, not that Dorman misled customers, is unpersuasive. Asserting that Dorman infringed on Dayco's trade dress, that the resemblance between the two company's products is not a coincidence, and that the products may be "misleading" to customers, has the potential to impute to Dorman an intent to mislead customers.[10]

Therefore, the Court dismisses Dorman's claim for defamation as to statements made by Dayco that assert or imply only that Dorman's products are inferior. This includes statements contained in the Dorman email, ¶ 37,[11] portions of the Dayco lawsuit, ¶¶ 33-34,[12] and the Walveart interview ¶ 45.[13] As to assertions that go beyond this mere "puffing"

---

[10] This conclusion is supported by the fact that Automotive Week/The Greensheet published a story indicating that Dayco had accused Dorman of "making false statements about the two companies products and intentionally deceiving purchasers by selling products with Dayco look-alike housing but that contain inferior quality and largely different types of internal parts." Compl. ¶ 42.

[11] The email communication incorporated in ¶ 37 is struck from the complaint in full as not actionable, except for the following statement: "The lawsuit highlights Dayco's concerns that Dorman's designs may mislead consumers due to the similarity in the external appearance of corresponding Dayco tensioners. . . .The differences between the products are not apparent, because the inner workings are hidden in look-alike housing." Compl. ex C at 1.

[12] Dorman specifically alleges that ¶ 50 of the Dayco Lawsuit, which reads "While the automatic belt tensioners sold and offered for sale by Dorman are thus slavish copies of the corresponding Original Dayco Products, even down to many arbitrary features of Original Dayco Products, they have been found to be of inferior quality as compared to OEM belt tensioners and genuine Dayco products," is defamatory. This statement is actionable insofar as it asserts that Dorman has created "slavish copies," but is not actionable as to the assertion that Dorman's products are inferior. Other statements asserting nothing more than that Dorman's products are inferior are similarly struck from the complaint. Statements, such as those contained in ¶ 1, which assert that "Dorman [perpetrated] a number of concerted, willful and malicious activities all aimed at deceiving purchasers. . . . [including] making false statements respecting Dorman and Dayco

12

and impute dishonesty or improper business practices to Dorman, however, Dorman has stated a viable cause of action and the Court denies Dayco's motion to dismiss as to these statements.[14]

C. <u>Count III: Tortious Interference with Prospective Contractual Relationships</u>

Dayco asserts that Dorman has pleaded insufficient facts to make out a claim for tortious interference with prospective contractual relationships. Dorman alleges in its complaint that Dayco committed tortious interference by making false and defamatory statements that deterred third persons from associating or dealing with Dorman, and by "intend[ing] to harm Dorman" through unfair competition, improper marketing techniques, and malicious interference with Dorman's prospective contractual relationships with the intent to stop those relationships from forming. Compl. ¶¶ 50, 66-67.

To state a claim for tortious interference with prospective contractual relationships, a plaintiff must plead and prove that: 1) plaintiff had prospective contractual relationships;

---

products, and intentionally deceiving purchasers by, for example, selling products in Dayco look-alike housing, but which contain inferior quality and largely different types of internal parts, a fact which is hidden from the consumer in Dayco look-alike housing, maliciously and brazenly calculated to deceive purchasers," are actionable because they impute dishonesty or improper business practices to Dorman.

[13]  The interview with Walveart in ¶ 45 is struck from the complaint in its entirety.

[14]  Compl. ¶¶ 24-25, which incorporate the Dayco PowerPoint Presentation, properly alleges statements which may be defamatory, with the exception of the following statements: "The DAYCO NO SLACK Aftermarket Tensioner is the market leader in aftermarket belt tensioners", ex. A at 2, and "Most DAYCO NO SLACK Aftermarket Tensioners incorporate two key patented features, which Dorman tensioners do not (and cannot)" and the forgoing description of these two features. ex. A at 4. These statements merely imply that Dorman's tensioners are inferior, and are, therefore, struck from the complaint.

13

2) defendant's purpose or intent was to harm the plaintiff by preventing the relation from occurring; 3) there was an absence of any privilege or justification on the part of the defendant; and 4) actual damage resulted from defendant's conduct. *Atlantic Paper Box Co. v. Whitman's Chocolates*, 844 F. Supp. 1038, 1047 (E.D. Pa. 1994).

Dayco alleges, in particular, that Dorman has failed to properly plead the second element of a tortious interference claim – that the purpose or intent of defendant was to harm the plaintiff. With regards to this element, Pennsylvania courts have held that "it must be emphasized that the tort we are considering is an intentional one: the actor is acting as he does for the purpose of causing harm to the plaintiff." *Glenn v. Point Park College*, 272 A.2d 895, 899 (Pa. 1971). Dorman asserts that Dayco's argument rests on application of the stricter standard of review applicable to fraud claims, while the pleading requirement for "intent" is more liberal. While Dorman is correct in its position that the pleading standard for intent is "more liberal" than the pleading standard for fraud, Dayco's argument does not apply the incorrect standard of review; rather, the defendant flags for the Court the recognition that pleading requirements have increased in recent years under *Iqbal* and *Twombly*.[15]

---

[15] Fed. R. Civ. P. 9(b) states that "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, or other conditions of a person's mind may be alleged generally." The Sixth Circuit recently clarified, however, that "[a]lthough more liberal than Rule 9(b), the pleading requirements under Rule 8 have increased significantly in recent years." *Woodland Harvesting, Inc. V. Ga. Pac. Corp.*, 693 F. Supp. 2d 732, 744 n. 13 (E.D. Mich. 2010). As such, Dorman's reliance, in both its brief and during oral argument, on a case decided before *Iqbal* and *Twombly*, *Synthes v. Globus Medical, Inc.*, No. 04-cv-1235, 2005 W.L. 2233441 (E.D. Pa. Sept. 14, 2005), for the proposition that Dorman met its burden in pleading tortious interference with a prospective business relationship is unpersuasive.

Dorman has done little more in its complaint than to plead the elements of the claim, supplemented by various conclusory statements. These allegations are insufficient to survive a motion to dismiss. *See Iqbal*, 129 S. Ct. at 1949 (holding that "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The assertions by Dorman that Dayco's statements were "defamatory", that Dayco engaged in unfair competition and that Dayco "maliciously interfer[ed] with Dorman's prospective contractual relationships" are legal conclusions, which the Court is not required to accept. *Id.* Aside from these legal conclusions, Dorman offers nothing more than its belief that Dayco intended to harm Dorman. A defendant's subjective belief does not raise the claim above a level of speculation. *See Ass'n of Cleveland Fire Fighters*, 502 F.3d at 548.

The present case is distinguishable from *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 725-26 (6th Cir. 2010). In *Fritz*, the plaintiff "alleged a set of facts which, if accepted by the trier of facts, would entitle the plaintiff to relief." *Id.* (plaintiff did not allege specific facts to support claim that defendant threatened business; alleging, even generally, that threats were made was sufficient to put defendant on notice of claim). Dorman has not alleged facts, which -- even if taken as true -- would entitle it to relief. The statements made by Dayco, do not, on their face, establish, or even give rise to the inference, that Dayco intended to harm any prospective contractual relationship Dorman may have had. The statements could just as plausibly be seen as statements intended to gain an economic advantage over a competitor in the market. Dorman must "plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949. A complaint falls short by pleading facts

15

"merely consistent with a defendant's liability." *Id.*

The parties do not discuss in detail the other elements of the claim. The Court finds, however, that Dorman has also failed to properly allege element one, that there was a prospective business relationship. Under Pennsylvania law, a prospective business relationship requires "something less than a contractual right, something more than a mere hope." *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 471 (Pa. 1979). Although certainty is not required, there must be a reasonable likelihood or probability of a contractual relationship. *Glenn*, 272 A.3d at 471 ("There must be something more than mere hope or the innate optimism of the salesman."). This standard requires that there is something more than evidence of an existing current business or contractual relationship. *See, e.g. Thompson,* 412 A.2d at 472 (finding that there was not a prospective business relationship where evidence showed that the parties had renewed a year-to-year lease for mineral rights for ten consecutive years).

Dorman alleges that "Dorman customers and prospective customers have informed Dorman sales personnel...that Dayco's claims and allegations...[have] caused them to decide not to purchase Dorman's automatic belt tensioners." Compl. ¶ 68. Dorman's allegation may fulfill the requirement for the fourth prong, that there was actual harm done by Dayco's statements, but it does not fulfill prong one. Simply alleging that there were "customers and prospective customers" who decided not to buy Dorman products does not show that there was a reasonable likelihood or probability of a contractual relationship.

Thus, Dorman has failed to plead facts sufficient to make out elements one and two of a claim for tortious interference with a prospective contractual relationship, and the Court dismisses Count III of Dorman's complaint without prejudice.

C. <u>Count IV: Pennsylvania Unfair Competition</u>

Count IV of the Complaint asserts a Pennsylvania state claim for common law unfair competition. Dorman alleges that Dayco engaged in unfair competition by making false statements about Dorman's automatic belt tensioners, by tortiously interfering with prospective business relationships, and by intending to create an illegal restraint on competition. Compl. ¶¶ 72, 73, 75.

Dayco argues that Pennsylvania state courts typically limit unfair competition claims to situations in which one company attempts to "pass off" their product as that of another company and to other similarly deceptive conduct. Dorman asserts that Pennsylvania law recognizes numerous bases for a claim of unfair competition, including tortious interference with a contract. Dorman further argues that Pennsylvania law tracks federal Lanham Act claims.

Common law liability for unfair competition is governed by local law. *Goebel Brewing Co. v. Esslingers, Inc.*, 95 A.2d 523, 525-26 (Pa. 1953). Pennsylvania state courts have traditionally restricted unfair competition claims to claims where one party is attempting to "pass off" their goods as those of another party. *See Pottstown Daily News Publ'g Co. v. Pottstown Broad. Co.*, 192 A.2d 657, 662 (Pa. 1963) ("Unfair competition, as known to the common law, is a limited concept. Primarily, and strictly, it relates to the palming off of one's goods as those of a rival trader.")*; Penn State Univ. v. Univ. Orthopedics, Ltd.*, 706 A.2d 863, 870-71 (Pa. Super. Ct. 1998) ("The gist of the action lies in the deception practiced in "passing off" the goods of one for the other."); *See also Scanvec Amiable, Ltd. v. Chang*, 80 Fed. Appx. 171, 173 (3rd Cir. 2003) ("A claim of unfair competition under Pennsylvania law requires proof that the defendant has "passed off" the goods of one

17

manufacturer...as those of another.").

"Passing off" has traditionally encompassed trademark infringement, and has been extended to encompass certain claims of misappropriation as well as misrepresentation. *See Pottstown*, 192 A.2d at 662; *Jessar Mfg. Corp. v. Berlin*, 110 A.2d 396, 400 (Pa. 1954); *Goebel Brewing Co.*, 95 A.2d at 526; *but cf. Corabi v. Curtis Publ'g Co.*, 273 A.2d 899, 918 (Pa. 1971) (refusing to extend unfair competition to claim of misappropriation of goodwill). There is no allegation here that Dayco attempted to "pass off" its product as Dorman's.

Dorman alleges that Pennsylvania courts have extended the basis for an unfair competition claim to include tortious interference with a contractual relationship and to track the Lanham Act. Although Dorman cites federal court cases for this proposition, it has not cited any state cases to support its argument, nor can the Court find any.

Although the Third Circuit has seemingly extended the grounds for a Pennsylvania unfair competition claim, the Pennsylvania state courts have not. In diversity cases, under the *Erie* doctrine,

> the highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by the federal courts as defining state law unless it has later given a clear and persuasive indication that the pronouncement will be modified, limited, or restricted.

*West v. American Tel. & Tel. Co.*, 311 U.S. 223 (U.S. 1940); *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). Under the *Erie* doctrine, this Court, sitting in diversity in the Sixth Circuit, is not in a position to extend the law beyond the bounds that the Pennsylvania Supreme Court has set. Therefore, the Court dismisses Dorman's claim for unfair

18

competition under Pennsylvania law, without prejudice.[16]

D. Petition to Amend Pleadings

Dorman requests that the Court grant leave to amend its Complaint as to any counts that are insufficiently pled. While Dorman is correct in asserting that leave to amend is generally granted,[17] Dorman has not properly moved for leave to amend. In *Louisiana School Employee's Retirement Sys. V. Ernst & Young, LLP*, No. 08-6194, 2010 WL 3655657 (6th Cir. 2010), the Sixth Circuit stated that:

> A bare request in an opposition to a motion to dismiss without any indication of the particular grounds on which amendment is sought...does not constitute a motion within the contemplation of [Fed. R. Civ. P. 15(a)]. A request for leave to amend almost as an aside, to the district court in a memorandum in opposition to the defendant's motion to dismiss. . .is not a motion to amend.

*Id.* at *13 (internal citations omitted). Dorman has done nothing more than make a bare request in its opposition motion, and therefore, the Court will not grant Dorman leave to

---

[16] Even if Pennsylvania has extended the claim to tortious interference with a prospective contractual relationship, Dorman has failed to state a viable claim for tortious interference. Further, when asserting that Pennsylvania Law tracks the Lanham Act, the Third Circuit has often juxtaposed this with the notion of "passing off" one's goods as another's. *See Scanvec*, 80 Fed. Appx. at 180 (claim for unfair competition under Pennsylvania law requires proof that defendant has "passed off" goods, and referencing *Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 582 (E.D. Pa. 2002) for proposition that the common law tracks section 43(a) of the Lanham Act); *Artus Corp. v. Nordic Co., Inc.,* 512 F.Supp. 1184, 1188 (Pennsylvania jurisprudence with respect to unfair competition tracks Lanham Act and asserting that "the test for unfair competition is the existence of a secondary meaning and the likelihood of confusion as to the source of the product.").

[17] Leave to amend should be granted "absent any apparent or declared reason, such as undue delay, bad faith, or dilatory motive on the part of the moving party, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, or the futility of the amendment" *Siedlik v. Stanley Works, Inc.*, 205 F. Supp. 762, 763 (E.D. Mich. 2002) (citing *Robinson v. Mich. Consol. Gas Co.*, 918 F.2d 579, 591 (6th Cir. 1990)).

amend its complaint.  Should Dorman wish to amend its complaint, it must file a proper motion under the federal rules for leave to do so.

### ORDER

**WHEREFORE,** it is hereby **ORDERED** that Dayco's Motion to Dismiss (docket no. 12) is **GRANTED IN PART AND DENIED IN PART** as to Count I,[18] and **GRANTED** as to Counts III and IV, which are dismissed without prejudice.

**SO ORDERED.**

s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: October 27, 2010

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on October 27, 2010, by electronic and/or ordinary mail.

Alissa Greer
Case Manager

---

[18] The specific statements which are dismissed and therefore stricken from the complaint are laid out above, *supra*, pages 12-13, footnotes 11-14.